**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 13-cv-00545-CMA-KMT

RASHANNA MARSHALL,

      Plaintiff,

v.

EXELIS SYSTEMS CORPORATION, and
LAWRENCE LINDLOFF,

      Defendants.

---

**ORDER GRANTING DEFENDANT LAWRENCE LINDLOFF'S AND EXCELIS'
MOTION TO DISMISS PLAINTIFF'S 42 U.S.C. § 1981 CLAIMS AND
RESERVING RULING ON EXELIS' MOTION TO DISMISS
PLAINTIFF'S OUTRAGOUS CONDUCT CLAIM**

---

In this employment discrimination action, Plaintiff Rashanna Marshall alleges that Defendants discriminated against her on the basis of race during her employment on Bagram Airfield, the largest military base in Afghanistan.  This matter is before the Court on Defendant Lawrence Lindloff's Motion to Dismiss Plaintiff's 42 U.S.C. § 1981 Claims Pursuant to Fed. R. Civ. P. 12(b)(6).  (Doc. # 44.)  Also before the Court is Defendant Exelis Systems Corporation's ("Exelis") Motion to Dismiss Plaintiff's 42 U.S.C. § 1981 and Outrageous Conduct Claims.  (Doc. # 47.)  For the reasons discussed below, the Court dismisses Plaintiff's Section 1981 claims and reserves ruling on her outrageous conduct claim.

## I.  BACKGROUND

### A.  FACTS[1]

Marshall, an African-American female, worked for Exelis for five years, starting in 2006.  Exelis employs over 7,800 employees worldwide and performs numerous contracts for the United States government related to defense services.  During her employment, Marshall worked at Bagram Airfield in Afghanistan.  (Doc. # 31, at 1-2.)

Marshall alleges that in the summer of 2011, she discovered that Defendants were discriminating against her and her African-American co-workers.  She alleges that Defendants passed her and other African Americans over for job opportunities and provided them less favorable terms and conditions of employment than were provided to their similarly situated non-African-American counterparts.  Marshall reported her concerns to her supervisor, Lindloff, and when he refused to remedy the problems, she reported her concerns to Exelis human resources and upper management.  (*Id*. at 1-2.)  Hours after meeting with upper management to discuss her concerns regarding race discrimination, Lindloff retaliated against Marshall by giving her a disciplinary write-up, in part because she "accused him of being a racist . . . ."  (*Id*. at 8.)

On November 9, 2011, Marshall began to experience chest pains.  She sought treatment at an on-base medical center, where a paramedic placed Marshall on bed rest pending further tests.  The paramedic wrote a letter informing Exelis of Marshall's condition.  Lindloff and another employee contacted the medical center to attempt to

---

[1]  Unless otherwise noted, the following facts are allegations from Plaintiff's Amended Complaint (Doc. # 31) and are deemed true for purposes of the instant motion.

verify the veracity of a letter and demanded information on Marshall's medical condition. (*Id.* at 9.)

On November 11, 2011, Lindloff fired Marshall.  Following her termination, Lindloff and another Exelis employee attempted to obtain access to Marshalls' medical records in an effort to provide a *post hoc* justification for her termination; however, medical employees refused to provide that information.  (*Id.* at 8-12.)

## B.   PROCEDURAL HISTORY

Plaintiff filed the instant action, alleging race discrimination and retaliation under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as well as claims of outrageous conduct and intentional interference with contract and/or prospective business advantage under Colorado law.  (Doc. # 31, at 13-23.)  Both Defendants moved to dismiss Marshall's 42 U.S.C. § 1981 claims, arguing that Section 1981 does not apply extraterritorially to conduct occurring in Afghanistan.  (Doc. ## 44, 47.)[2] In considering the merits of these motions, the Court has reviewed the motions, Marshall's responses, the replies, as well as supplemental briefing ordered by the Court.  (Doc. ## 44, 45, 47, 48, 56, 60, 65, 66.)

## II.  STANDARD OF REVIEW

A motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) tests the formal sufficiency of a complaint.  *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003).  A complaint will survive such a motion if it contains "enough facts to

---

[2]  Exelis also moves to dismiss Marshall's outrageous conduct claim.  (Doc. # 44.)  The Court reserves ruling on this portion of Exelis's motion.

state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007).  For a motion to dismiss, "[t]he question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991).  Nevertheless, a complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which a relief may be granted." *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

Whether a statute applies to extraterritorial conduct does not concern subject matter jurisdiction.  Rather, by determining what conduct a statute reaches (and consequently, what conduct a statute prohibits), courts define the merits of the plaintiff's substantive claim. *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2877-78 (2010).  Therefore, when a court determines a statute does not apply extraterritorially, it properly dismisses the corresponding claims under Fed. R. Civ. P. 12(b)(6). *Id.*

## III. <u>DISCUSSION</u>

Defendants move to dismiss Marshall's employment discrimination and retaliation claims arising under 42 U.S.C. § 1981, arguing that Section 1981 does not apply extraterritorially to conduct in Afghanistan.  Marshall responds with the novel argument that under the framework of *Boumediene v. Bush*, 553 U.S. 723 (2008), Bagram Airfield is a *de facto* territory of the United States and thus concerns about Section 1981's extraterritorial application are not implicated.  She also argues that, because she is "a person within the jurisdiction of the United States" under the language of Section 1981, extraterritorial application is not required.  These competing arguments draw upon three lines of cases dealing with the extraterritorial application of U.S. laws, the Constitution, and Section 1981 in particular, which the Court will discuss in turn.  However, first, the Court provides an overview of the history of Section 1981.

### A.    SECTION 1981 AND ITS HISTORY

Section 1981 was passed following the Civil War as a part of the Civil Rights Act of 1866.  *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 410 U.S. 431, 434 (1973).  Congress initially passed Section 1981 to enforce the Thirteenth Amendment's prohibition against slavery and as a counter to the "Black Codes"—laws passed in several southern states immediately following the ratification of the Thirteenth Amendment that were designed to restrict African Americans' rights and freedoms.  George Rutherglen, *The Improbable History of Section 1981: Clio Still Bemused and Confused*, 55 Sup. Ct. Rev. 303, 308-09 (2003) (hereinafter "The Improbable History").

Following the adoption of the Fourteenth Amendment, Congress reenacted Section 1981 as a part of the Enforcement Act of 1870. *Hurd v. Hodge,* 334 U.S. 24, 32-33 (1948). Despite its apparent importance in early civil rights legislation, Section 1981 fell into a long period of disuse, in part due to the Supreme Court's decision in the *Civil Rights Cases.* 109 U.S. 3 (1883) (although the Thirteenth Amendment applies to private conduct, Congress's power related to that amendment was limited to ensuring an end to slavery and did not extend to eliminating discrimination); *see also The Improbable History*, 55 Sup. Ct. Rev. 303, 325-28 (2003). In *Ruyon v. McCrary*, the Supreme Court extended Section 1981's coverage to prohibit discrimination in private contracting. 427 U.S. 160, 173 (1976).

Congress amended Section 1981 in the Civil Rights Act of 1991. Section 1981 now states, in pertinent part, as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.[3] Distinct from the familiar framework of Title VII, Section 1981 provides its own remedies for employment discrimination. *Johnson v. Railway Express*

---

[3] The pertinent language of prior versions of the act is as follows.

The Civil Rights Act of 1866, 14 Stat 27:

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or

*Agency, Inc.*, 421 U.S. 454, 460-61 (1975).[4]  Although Congress has amended Title VII

to reach conduct occurring outside of the United States, it has not so amended Section

1981.  *See Ofori-Tenkorang v. Am. Int'l Grp., Inc.*, 460 F.3d 296, 298 (2d Cir. 2006)

(citing Civil Rights Act of 1991, Pub. L. No. 102–166, § 109, 105 Stat. 1071, 1077

(codified at 42 U.S.C. §§ 2000e, 12111) (amending the definition of "employee" in Title

VII to include United States citizens employed in foreign countries)).

## B.  OVERVIEW OF APPLICABLE PRECEPTS OF EXTRATERRITORIALITY

### 1.  Presumption against Extraterritoriality

The Supreme Court has long recognized the extraterritorial application of the

Constitution.  *See Boumediene*, 553 U.S. at 755.  And indubitably, Congress has the

authority to regulate the conduct of United States employers outside of the territorial

---

involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts . . . .

The Enforcement Act of 1870, 16 Stat 140, Sec. 16:

*And be it further enacted*, That all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts . . . .

The Revised Statutes of 1874, Sec. 1977:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and no other.

[4]  Section 1981 also applies to other forms of discrimination outside of the realm of employment. *See, e.g., Watson v Fraternal Order of Eagles*, 915 F.2d 235 (6th Cir. 1990) (removal of black partygoers from private party at private club states claim under section 1981); *Wright v Salisbury Club, Ltd.*, 632 F.2d 309 (4th Cir. 1980) (exclusion from club violates section 1981); *Olzman v Lake Hills Swim Club, Inc.*, 495 F.2d 1333 (2d Cir. 1974) (allegations of racially discriminatory operation of swimming club state claim under section 1981).

jurisdiction of the United States.  *See, e.g., EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*").  However, it is a "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'"  *Id.* (quoting *Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 285 (1949)).  This principle represents a canon of construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate.  *See Blackmer v. United States,* 284 U.S. 421, 437 (1932).  The presumption rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters.  *Smith v. United States,* 507 U.S. 197, 204, n. 5 (1993).  Thus, "unless there is the affirmative intention of the Congress clearly expressed" to give a statute extraterritorial effect, courts "presume it is primarily concerned with domestic conditions."  *Aramco,* 499 U.S. at 248 (internal quotation marks omitted).

The underlying policy of the presumption against extraterritoriality is to prevent United States laws from conflicting with the laws of sovereign nations within their own territories.  *See McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21 (1963); *Foley Bros., Inc.*, 336 U.S. at 285-86.  Indeed, the presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord."  *Aramco*, 499 U.S. at 428 (quoting *Foley Bros.,* 336 U.S. at 285).  Yet, the presumption applies regardless of whether there is a risk of conflict between the American statute and a foreign law.  *See Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 173-174 (1993).

In determining whether Congress has given a statute extraterritorial effect, courts consider "all available evidence about the meaning" of the statute, including its text, structure, and legislative history. *Id.*; *see also Smith,* 507 U.S. at 201-03 (reviewing text, structure, and legislative history to determine extraterritoriality of Federal Tort Claims Act). "When a statute gives no clear indication of an extraterritorial application, it has none." *Morrison*, 130 S. Ct. at 2877-78. The Supreme Court has directed that courts "apply the presumption in all cases, preserving a stable background against which Congress can legislate with predictable effects." *Id.* at 2881.

  2.  <u>Principles of Extraterritoriality in Habeas Cases</u>

Notwithstanding the proclamation in *Morrison* that consistent application of the presumption will provide predictability in determining whether legislative acts have extraterritorial effect, the Supreme Court has not applied the presumption consistently.[5] In *Rasul v. Bush,* the Supreme Court ruled that the presumption against extraterritoriality would not apply "to the operation of the habeas statute with respect to persons detained within 'the territorial jurisdiction' of the United States." 542 U.S. 466,

---

[5]  John H. Knox, *A Presumption Against Extrajurisdictionality*, 104 Am. J. Int'l L. 351, 352 (2010). *Compare Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 173-74 (1993) (applying presumption to U.S. Coast Guard ship outside U.S. waters), *and Smith v. United States*, 507 U.S. 197, 203-04 (1993) (applying presumption to tort involving U.S. national working for U.S. government in Antarctica), *and United States v. Spelar*, 338 U.S. 217, 222 (1949) (applying presumption to U.S. military base in Newfoundland but determining the leases do not transfer sovereignty), *with Rasul v. Bush*, 542 U.S. 466 (2004) (rejecting application of presumption to U.S. military base in Cuba), *and Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 386-90 (1948) (ignoring presumption in applying law to U.S. military base in Bermuda, reasoning that where "the purpose is to regulate labor in an area vital to our national life, it seems reasonable to interpret its provisions to have force where the nation has sole power, rather than to limit the coverage to sovereignty.").

480 (2004) (citing *Foley Bros.*, 336 U.S. at 285).  The Court looked to the United States'

lease agreement with Cuba and determined that the agreement's express terms give

the United States "complete jurisdiction and control over Guantánamo Bay Naval Base"

and allow the United States to "continue to exercise such control permanently if it so

chooses."  *Id.* (internal quotation marks omitted).  Thus, non-citizen detainees could

assert claims under the habeas statute for claims arising out of the Guantánamo Bay

Naval Base.  *Id.* at 484-85.[6]

Having decided that the presumption did not apply in *Rasul*, in *Boumediene*, the

Supreme Court turned to consider whether the protections of the writ of habeas corpus

under the Suspension Clause of the U.S. Constitution gave detainees in Guantánamo

Bay access to the writ.  The Court reasoned that, although the United States did not

exercise *de jure* sovereignty over Guantánamo Bay, "the obvious and uncontested fact

that the United States, by virtue of its complete jurisdiction and control over the base,

maintains *de facto* sovereignty over this territory."  *Boumediene*, 553 U.S. at 755.  Thus,

based upon the history of common-law habeas corpus, Supreme Court precedents, and

separation-of-powers principles, the Court rejected the premise that "*de jure* sovereignty

---

[6] Justice Scalia foreshadowed the problem presented in the instant case in his criticism of the
*Rasul* majority's reasoning for not applying the presumption against extraterritoriality:

> The Court does not explain how "complete jurisdiction and control" without
> sovereignty causes an enclave to be part of the United States for purposes of its
> domestic laws. Since "jurisdiction and control" obtained through a lease is no
> different in effect from "jurisdiction and control" acquired by lawful force of arms,
> parts of Afghanistan and Iraq should logically be regarded as subject to our
> domestic laws. . . .

*Rasul*, 542 U.S. at 501 (J. Scalia, dissenting).

is the touchtone of habeas corpus jurisdiction." *Id.*  In discussing its prior precedents,

the Court reasoned that the "common thread uniting the Insular Cases, *Reid*, and

*Eisentrager* [is] the idea that questions of extraterritoriality turn on objective factors and

practical concerns, not formalism." *Id.* at 764.[7]  With this in mind, the Court concluded

that "at least three factors are relevant in determining the reach of the Suspension

Clause." *Id.* at 766.  Those factors are:

> (1) the citizenship and status of the detainee and the adequacy of the
> process through which that status determination was made; (2) the nature
> of the sites where apprehension and then detention took place; and (3) the
> practical obstacles inherent in resolving the prisoner's entitlement to the
> writ.

*Id.*  Thus, the Court endorsed a "functional approach to questions of extraterritoriality,"

*id.* at 763, and explicitly repudiated a "formalistic sovereignty-based test for determining

the reach of the Suspension Clause," *id.* at 762.  In two recent cases, the D.C. Circuit

had occasion to apply the functional approach to Bagram Airfield and concluded that the

writ did not extend to detainees held there.  *Al Maqaleh v. Hagel*, 437 F.3d 312 (D.C.

---

[7]  The Insular Cases are a series of opinions in which the Supreme Court "addressed whether the Constitution, by its own force, applies to any territory that is not a state." *Boumediene*, 553 U.S. at 756 (citing the "Insular Cases": *De Lima v. Bidwell,* 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901); *Dooley v. United States,* 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901); *Armstrong v. United States,* 182 U.S. 243, 21 S.Ct. 827, 45 L.Ed. 1086 (1901); *Downes v. Bidwell,* 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); *Hawaii v. Mankichi,* 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 1016 (1903); *Dorr v. United States,* 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904)).  In *Reid v. Covert*, a plurality concluded that the Fifth and Sixth Amendments apply to American civilians tried outside the United States.  351 U.S. 487 (1956).  In *Johnson v. Eisentrager*, the Court denied German nationals held at Landsberg Prison in Germany access to the writ, noting that the prisoners "at no relevant time were within any territory over which the United States is sovereign, and the scenes of their offense, their capture, their trial and their punishment were all beyond the territorial jurisdiction of any court of the United States." 339 U.S. 763, 778 (1950).

Cir. 2013) ("*Al Maqaleh II*"); *Al Maqaleh v. Gates*, 605 F.3d 84 (D.C. Cir. 2010)

("*Al Maqaleh I*").

    3.    <u>Cases Analyzing the Extraterritorial Reach of Section 1981 to Military</u>
<u>Bases</u>

    The inconsistency with which courts have applied the presumption against

extraterritoriality is also evident in cases involving Section 1981. [8]  Nonetheless, courts

that have addressed the extraterritorial reach of Section 1981 have consistently

determined that the statute does not apply to conduct outside of the United States.

*See Ofori-Tenkorang v. Am. Int'l Grp., Inc.*, 460 F.3d 296, 302 (2d Cir. 2006) (collecting

cases).  In *Ofori-Tenkorang*, the seminal case on the extraterritoriality of Section 1981,

the Second Circuit reviewed Section 1981's text and legislative history and determined

that it did not apply to conduct that occurred while a non-citizen plaintiff was living and

working in South Africa for an American company.  *Id.* at 298.

    In cases that specifically involve the application of Section 1981 to military

bases situated outside of the United States, courts have inconsistently applied the

presumption, yet have consistently determined that Section 1981 does not apply to

conduct occurring on those military bases.  In *Gallaspy v. Raytheon Technical Services*

*Co.*, a district court reasoned, somewhat circularly, that Section 1981 did not apply to

conduct occurring on a U.S. military base in South Korea because "agreements

---

[8]  *See, e.g., Ortiz–Bou v. Universidad Autonoma de Guadalajara,* 382 F. Supp. 2d 293, 296–97
(D. P.R. 2005) (applying presumption); *de Lazzari Barbosa v. Merck & Co.,* No. Civ. 01–CV–
2235, 2002 WL 32348281, at * 2 (E.D. Pa. Mar. 11, 2002) (no mention of presumption); *Mithani
v. J.P. Morgan Chase & Co.,* No. 01 CIV 5928, 2001 WL 1488213, at *1 (S.D.N.Y.  Nov. 21,
2001) (no mention of presumption); *Gantchar v. United Airlines,* No. 93 C 1457, 1995 WL
798600, at *2 (N.D. Ill. Apr. 21, 1995) (applying presumption); *Theus v. Pioneer Hi–Bred Int'l,
Inc.,* 738 F. Supp. 1252, 1255 (S.D. Iowa 1990) (applying presumption).

between the United States and South Korea establishing United States bases in Korea are Korean territory." No. EP-04-CV-0012-FM, 2005 WL 1902534, *5 (W.D. Tex. Aug. 9, 2005). The *Gallaspy* court also acknowledged that, in the Mutual Defense Treaty, "Korea merely granted the United States the 'right to dispose United States . . . forces in and about the territory of the Republic of Korea.'" *Id.* (ellipses in original). Thus, the court concluded that "because the United States has merely been granted the use of Korean territory and Section 1981 only extends to 'every State and Territory,' [it] cannot provide relief for Plaintiff's claims." *Id.* The *Gallaspy* court made no mention of the presumption or the impact of *Rasul* on that presumption.

In *Collins v. CSA*, *Ltd.*, another district court considered whether Section 1981 applied to conduct that occurred on a United States military bases in Kuwait. No. 3:11-CV-0179-G, 2012 WL 1059025, *1 (N.D. Tex. Mar. 27, 2012). Applying the presumption against extraterritoriality, the court determined that the "statute contains no suggestion . . . that it should apply outside of the United States, or indeed, outside of the physical boundaries of any state or territory of the United States." *Id.* at *2. Although the court did not discuss the impact of *Rasul* and *Boumediene* on its decision to do so, the court briefly mentioned the Status of Forces Agreement ("SOFA") that governs the presence of United States forces at the bases at issue. However, the court ultimately determined that it could not base its determination of whether those bases in Kuwait were within U.S. territory within the meaning of Section 1981 because the SOFA was classified and therefore the court could not know with any certainty its contents. *Id.* at *3. Dismissing the question of whether the Kuwait bases were within U.S. territory as

13

"tangential," the court concluded that "United States military bases abroad are not 'within the jurisdiction of the United States' referred to in Section 1981(a)." *Id.*

Against this backdrop of cases and with these principles in mind, the Court turns to the instant case.

## C.    ANALYSIS

### 1.    Is Bagram Airfield a *De Facto* Territory of the United States?

In her court-ordered supplemental brief, Plaintiff seizes upon the line of reasoning in *Rasul* and *Boumediene* to argue that the extent of jurisdiction and control over Bagram Airfield renders it a *de facto* territory of the United States.  (Doc. # 67, at 2.)  Therefore, Plaintiff argues, this Court should declare that her Section 1981 claims are viable even though they arose from conduct outside of the *de jure* territory of the United States.  (*Id.*)  The Court declines to do so for several reasons.

In *Rasul*, the Supreme Court determined that "the United States exercises complete jurisdiction and control over the Guantánamo Bay Naval Base," and therefore persons detained there were "within the territorial jurisdiction of the United States."  542 U.S. at 480.  Plaintiff, pointing to the United States' lease agreement for Bagram Airfield and SOFA with Afghanistan, argues that the United States similarly enjoys complete control and jurisdiction over Bagram.  However, this position has already been rejected by courts considering the extension of the writ of habeas and other laws to Bagram. *See, e.g., Al Maqaleh II,* 738 F.3d at 327-28 (habeas); *Ali v. Rumsfeld*, 649 F.3d 762, 771-72 (D.C. Cir. 2011) (Fifth and Eight Amendment); *Al Maqaleh I*, 605 F.3d at 97 (habeas).  Those decisions make clear that, unlike Guantánamo, the United States

has not demonstrated intent to exercise sovereignty over Bagram "with permanence." *Al Maqaleh I*, 605 F.3d at 97.  Indeed, only a few months ago, the D.C. Circuit reaffirmed this determination stating, "[s]ubsequent events have confirmed, not undermined, the Government's declared intention [not to establish a permanent base at Bagram]."  *Al Maqaleh II,* 738 F.3d at 328.

Plaintiff argues that the aforementioned three factors applied in the *Boumediene* Court's functional analysis of whether the Suspension Clause reaches Guantánamo supports her argument that Section 1981 reaches Bagram.  (Doc. # 67, at 7-11.) However, Plaintiff's argument is misplaced.  First, factors concerning the "adequacy of the process through which [a detainee's] status is made" and "practical obstacles inherent in resolving a prisoner's entitlement to the writ" have little relevance here. More importantly, Plaintiff's argument that Section 1981 should be treated in a fashion similar to the writ of habeas discounts the importance that *Rasul* and *Boumediene* placed on the writ as an essential limit on government power.  *Boumediene* is not simply a rights-based decision which bestows rights and freedoms upon those at Guantánamo.  Rather, it is a limitation on government power to act extra-judicially in a place that is functionally a territory of the United States.  *See Boumediene*, 553 U.S. at 772 ("The gravity of the separation-of-powers issues raised by these cases and the fact that these detainees have been denied meaningful access to a judicial forum for a period of years render these cases exceptional.")  Thus, the writ of habeas corpus is not only an individual right, it is also an important check on the power of government.

Conversely, the instant case involves a private action by a private individual against a private corporation and a private individual.

For these reasons, the Court determines that *Boumediene's* functional approach is inapposite to the question of whether Section 1981 applies to conduct at Bagram Airfield.  Moreover, although not directly on point, the analysis in *Al Maqaleh II, Ali*, and *Al Maqaleh* is sound.  For the reasons set forth in those cases, this Court concludes that Bagram is not a *de facto* territory of the United States.  *See Al Maqaleh II,* 738 F.3d at 327-28; *Ali*, 649 F.3d at 771-72; *Al Maqaleh I*, 605 F.3d at 97.  Thus, traditional cannons of statutory interpretation, beginning with the presumption against extraterritoriality, are dispositive in the instant case.

2.    Does the presumption against extraterritoriality apply?

Although the parties in this case filed a total of eight submissions on the question of the extraterritorial reach of Section 1981, including supplemental briefing ordered by this Court to clarify their arguments, not one party cited to *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), the Supreme Court case which guides this Court's analysis.  In *Morrison*, the Supreme Court announced two inquiries, which are discussed below, that a court should undertake when determining the application of the presumption against extraterritoriality.  130 S. Ct. at 2881-87 (discussing Section 10(b) of the Securities Exchange Act).  First, a court should review a statute's text and context to determine whether Congress intended to rebut the presumption.  *Id.* at 2281-83.  Second, a court determines whether the focus of the substantive law is extraterritorial or

domestic, such that the presumption is inapplicable.  *Id.* at 2884-85.  In applying this

standard, this Court heeds the warning from the Supreme Court that

> judicial-speculation-made-law—divining what Congress would have
> wanted if it had thought of the situation before the court—demonstrate[s]
> the wisdom of the presumption against extraterritoriality. Rather than
> guess anew in each case, [courts] apply the presumption in all cases,
> preserving a stable background against which Congress can legislate with
> predictable effects.

*Id.* at 2881.

> a)   *Affirmative evidence that Congress intended to rebut the
> presumption*

First, *Morrison* directs courts to analyze the statute's text and context to

determine whether Congress provided any guidance sufficient to rebut the presumption.

*Id.* at 2881-83.  If there is no affirmative evidence that Congress intended for the statute

to apply extraterritorially, the presumption applies.  *Id.*; *Kiobel v. Royal Dutch Petroleum

Co.*, 133 S. Ct. 1659, 1666 (2013) ("[T]o rebut the presumption, [the statute] would need

to evince a clear indication of extraterritoriality.") (internal citations and quotation marks

omitted).

This Court's review of the text and context of Section 1981 shows no affirmative

evidence that Congress intended for the statute to apply beyond the territorial

jurisdiction of the United States.  To the contrary, section 1981 expressly states that the

rights it protects are valid "in every State and Territory."  *See Ortiz-Bou v. Universidad

Autonoma de Guadalajara*, 382 F. Supp. 2d 293, 296-97 (D. P.R. 2005); *Theus v.

Pioneer Hi–Bred Int'l, Inc.,* 738 F. Supp. 1252, 1254 (S.D. Iowa 1990) ("The plain

language of § 1981 does not reveal any intent to extend extraterritorial coverage to

17

victims of racial discrimination."); *see also Foley,* 336 U.S. at 285 (Eight Hour Act did

not apply extraterritorially because "nothing in the Act itself . . . nor in the legislative

history . . . [led] to the belief that Congress entertained any intention other than the

normal one.")  The Supreme Court has previously construed Congress's use of "States"

to denote its intention to not give a statute extraterritorial effect.  *See Aramco,* 499 U.S.

at 256 (finding persuasive that "Title VII consistently speaks in terms of 'States' [and]

fails to mention foreign nations . . . .")  Thus, Section 1981's plain language limits

the statute's reach to domestic conduct, and does not extend it extraterritorially.

Despite the fact that both Defendants argue the presumption against

extraterritoriality applies, in her respective responses to Defendants' motions, Plaintiff

fails to address the presumption.  Instead, Plaintiff contends that Section 1981's plain

language shows that the statute applies to her employment at Bagram Airfield because

she is a "person within the jurisdiction of the United States."  (Doc. # 45, at 3-5) (quoting

42 U.S.C. § 1981).  Thus, Plaintiff argues, "this Court does not need to consider

whether the language of § 1981 gives any indication of a congressional purpose

to extend its coverage" extraterritorially.  (*Id.*) (internal quotation marks and citation

omitted.)  While this line of reasoning is a tempting shortcut that would take the analysis

outside of the realm of inconsistent jurisprudence surrounding the presumption, the

Court thinks it not wise to deviate from the clear admonishment that the presumption

should apply "in all cases, [to] preserv[e] a stable background against which Congress

can legislate with predictable effects."  *Morrison*, 130 S. Ct. at 2881.

Furthermore, Plaintiff's interpretation of this language ignores case law instructing that this Court's inquiry must focus both on the legal status of the plaintiff **and** the location in which the conduct occurred.  *See Ofori-Tenkorang*, 460 F.3d at 302 ("The statute not only restricts coverage to conduct taking place in our 'state[s] or territory[ies],' but also confines the availability of its protections to 'persons within the jurisdiction of the United States.'"); *see also Aramco*, 499 U.S. at 246 (applying the presumption to determine whether "Title VII applies extraterritorially to regulate the employment practices of United States employees who employ United States citizens abroad").  Plaintiff's proposed interpretation also asks this Court to ignore the statute's express limitation to conduct taking place in our "State[s]" or "Territor[ies]." *Ofori-Tenkorang*, 460 F.3d at 302.  This, the Court cannot do.  *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (a "court should not confine itself to examining a particular statutory provision in isolation").

Plaintiff also contends that Congress's 1870 amendments to Section 1981 support her argument that the statute's protections "apply to persons at a U.S. airfield within the jurisdiction of the United States."  (Doc. # 45, at 5.)  As initially adopted, Section 1981 stated:

> [A]ll persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude . . . shall have the same right, in every State and Territory in the United States, to make and enforce contracts . . . .

The Civil Rights Act of 1866, 14 Stat 27.  This language was changed by the Enforcement Act of 1870 to state, "all persons within the jurisdiction of the United States

shall have the same right in every State and Territory in the United States to make and enforce contracts . . . ."  16 Stat 140, Sec. 16.  Plaintiff argues that this language "broadened the application of the statute beyond just individuals in the states and territories . . . ."  (Doc. # 45, at 6) (quotation marks omitted).  However, analyzing that same history and text, in *Theus*, another court concluded that same language "solely refers to persons within United States territory."  738 F. Supp. at 1255.  Although the Court acknowledges that it may use "all available evidence" to determine extraterritoriality, *Haitian Centers Council, Inc.*, 509 U.S. at 177, these two disparate theories of the same language demonstrate the danger of using legislative history to find "one's friends."  *See Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (J. Scalia, concurring) ("[T]he use of legislative history [is] the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends.")  And, the Supreme Court has instructed that "possible interpretations of statutory language do not override the presumption against extraterritoriality."  *Morrison,* 130 S. Ct. at 2883.

Plaintiff also contends that Congress evidenced intent to apply Section 1981 broadly when it amended the language in that statute, but not in its companion, Section 1982.  (Doc. # 45, at 7-8.)  This comparison likewise lends itself to a contrary interpretation because it ignores the historical backdrop in which these changes were made.  The 1866 version of Section 1981 conferred citizenship upon African Americans, who were previously denied that right by the infamous *Dred Scott* decision.  *Dred Scott v. Sandford,* 60 U.S. 393 (1856).  In 1868, the Fourteenth Amendment was adopted. It states, "All persons born or naturalized in the United States, and subject to the

jurisdiction thereof, are citizens of the United States . . . ."  U.S. Const. amend. XIV. § 1.

Therefore, the language was removed from Section 1981 as duplicative of the new

amendment.  *See United States v. Wong Kim Ark*, 169 U.S. 649, 675 (1898) (After

passing the 1866 Act, "[t]he same congress, shortly afterwards, evidently thinking it

unwise, and perhaps unsafe, to leave so important a declaration of rights to depend

upon an ordinary act of legislation, which might be repealed by any subsequent

congress, framed the fourteenth amendment of the constitution  . . . .")

 Notwithstanding Plaintiff's arguments, "When it desires to do so, Congress knows

how to place the high seas within the jurisdictional reach of the statute."  *Argentine*

*Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 440 (1989).  The legislative

history of Section 1981 confirms, rather than refutes, Congress's intention that Section

1981 was to apply only domestically.  The most recent amendments to Section 1981

were made as a part of the Civil Rights Act of 1991.  That same legislation abrogated

the Supreme Court's determination in *Aramco* that Title VII did not apply extraterritorially

by changing the definition of employee to include "any individual who is a citizen of the

United States employed by an employer in a workplace in a foreign country."  *Torrico v.*

*Int'l Bus. Machines Corp.*, 213 F. Supp. 2d 390, 397 (S.D.N.Y. 2002); *see also Ofori-*

*Tenkorang*, 460 F.3d at 302; *Souryal v. Torress Advanced Enterprise Solutions, LLC*,

847 F. Supp. 2d 835, 842 (E.D. Va. 2012).  "Similarly, in 1984, Congress amended the

definition of employee in Section 11(f) of the Age Discrimination in Employment Act of

1967, 29 U.S.C. § 621 *et seq.* ('ADEA'), to make provisions of the ADEA apply to

citizens of the United States employed in foreign countries by U.S. corporations or

their subsidiaries." *Ofori-Tenkorang*, 460 F.3d at 303 (internal quotation marks and alterations omitted) (citing *Aramco,* 499 U.S. at 259; Pub L. No. 98–459, § 802, 98 Stat. 1767, 1792 (1984) (codified at 29 U.S.C. § 630(f)).  And indeed, Congress has specifically extended the coverage of its legislation to military bases.  *See, e.g.,* The Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* (authorizing compensation for "any employee engaged in any employment at any military, air, or naval base . . . .")  Because Congress has not done so here, the Court will not infer extraterritorial reach.  *See Morrison*, 130 S. Ct. at 2877-78; *Aramco*, 499 U.S. at 246.

"When a statute gives no clear indication of an extraterritorial application, it has none."  *Morrison*, 130 S. Ct. at 2877-78.  Thus, because Congress has not clearly spoken on its extraterritorial application, the presumption against extraterritoriality dictates that Section 1981 does not apply to employees working outside of the United States or its territories.

> b)     The "focus" of Section 1981

Next, the *Morrison* Court considered whether the focus of the substantive law is extraterritorial or domestic.  *Id.* at 2884-85.  The cause of action falls outside of the scope of the presumption if the event or relationship that was the "focus of the congressional concern" of the statute takes place within the United States.  *Id.* at 2284.  The *Morrison* Court warned, "[T]he presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever **some** domestic activity is involved in the case."  *Id.* (emphasis in original).  However, unlike the plaintiff

in *Morrison*, in the instant case, Plaintiff does not allege that she seeks merely domestic application of Section 1981.  Accordingly, "all relevant conduct took place outside the United States" and any other conduct that did "touch and concern the territory of the United States [did not] do so with sufficient force to displace the presumption against extraterritorial application."  *Kiobel*, 133 S. Ct. at 1669.

## IV. <u>CONCLUSION</u>

Throughout its case law on the issue of extraterritoriality, the Supreme Court cautions courts against the folly of legislating from the bench.  *See id.* at 1664 (warning against the "danger of unwarranted judicial interference in the conduct of foreign policy"); *Morrison*, 130 S. Ct. at 2881; *Aramco,* 499 U.S. at 259.  Because it is for Congress, not the Judiciary, to displace the presumption, this Court determines that Section 1981 does not reach conduct on Bagram Airfield.

Accordingly, it is ORDERED that Defendant Lawrence Lindloff's Motion to Dismiss Plaintiff's 42 U.S.C. § 1981 Claims Pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. # 44) is GRANTED.   It is

FURTHER ORDERED that Defendant Exelis Systems Corporation's Motion to Dismiss Plaintiff's 42 U.S.C. § 1981 and Outrageous Conduct Claims (Doc. # 47) is GRANTED IN PART with respect to its arguments regarding Plaintiff's Section 1981 claims.  The Court will reserve ruling on the remainder of that motion.  It is

FURTHER ORDERED that Plaintiff's Section 1981 claims are DISMISSED WITH

PREJUDICE.

DATED:  March __24__, 2014

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge