**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 13-cv-00545-CMA-KMT

RASHANNA MARSHALL,

      Plaintiff,

v.

EXELIS SYSTEMS CORPORATION, and
LAWRENCE LINDLOFF,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

---

In this employment discrimination action, Plaintiff Rashanna Marshall alleges that

Defendants discriminated against her on the basis of race during her employment on

Bagram Airfield in Afghanistan.  This matter is before the Court on Defendant Exelis

Systems Corporation's ("Exelis") Motion for Summary Judgment (Doc. # 78) and

Defendant Lawrence Lindloff's Motion for Summary Judgment (Doc. # 79).  For the

reasons discussed below, the Court grants in part and denies in part both motions.

## I.   BACKGROUND[1]

In June 2006, Marshall began working for Exelis at Bagram Airfield.  (Doc. # 78,

¶ 1.)  In February 2011, Lindloff became the Afghanistan Country Manager and one of

Marshall's supervisors.  (*Id.*, ¶¶ 7, 8.)  Starting in approximately May 2011, Marshall

---

[1] Unless otherwise noted, these facts are deemed undisputed.  The Court sets forth facts only
as necessary to address the pertinent arguments in Defendants' motions.

began to complain to Lindloff that Exelis failed to consider her and other qualified

African Americans for a promotion from Network Administrator to Temporary Section

Lead, which was given to Robert Coapman, who is white.  (Doc. # 116, ¶¶ 16, 17.)

On May 26, 2011, Site Manager Robert Payne requested a merit-pay increase

for Marshall because he "really would like to keep her on Bagram" due to her

"knowledge of the network  . . . ."  (Doc. # 78, ¶ 27.)  However, her pay increase was

denied.  Simultaneously, Exelis approved a merit increase for Marshall's white co-

worker.  (Doc. # 116, ¶ 28.)  Later, Lindloff told Marshall that her request was denied

because it was not his policy to give out-of-cycle raises.  (Doc. # 78, ¶ 44.)

In August of 2011, Lindloff complained that Marshall had raised her voice and

spoke to him in disrespectful tone.  Although Marshall denied doing so, Lindloff gave her

a written warning.  (Doc. # 78, ¶ 41.)  Marshall alleges that the written warning was in

retaliation for her complaints about race discrimination.  (Doc. # 116, ¶ 41.)

Between October 24 and November 7, Exelis decided that all Network

Administrators would work at the South Node, resulting in Marshall's and her fiancé

Andre Hill's assignment to that location.   (Doc. # 78, ¶ 52.)  Exelis tested employees'

technical abilities through a "tech out," which Hill did not pass.  (*Id.,* ¶¶ 53, 56.)  Hill was

demoted to Help Desk Administrator and told he would be transferred to another site in

Afghanistan.  (*Id.*, ¶ 59.)  On November 7, 2012, Marshall inquired whether Lindloff

would treat her request to transfer to join Hill "equally."  (Doc. # 78-1 at 37.)  During the

meeting, Marshall accused Lindloff of dismissing her concerns by rolling his eyes.  (Doc.

# 116, ¶ 65.)  The following day, Lindloff drafted a final written warning in which he

stated that during the meeting, Marshall accused him of "being a racist, rolling [his] eyes, and acting inappropriately" and reprimanded her for being "loud and unprofessional." (Doc. # 78-4.) Marshall denied that she behaved in an inappropriate manner. (Doc. # 116, ¶ 74.)

Lindloff forwarded the warning to Program Manager Harry Loper and Human Resources Professional Bridget Bailey, who held a conference call with Marshall that day. (Doc. # 78, ¶¶ 72, 73.) During the call, Marshall repeated her concerns that Lindloff was racist and treated her and other African Americans unfairly because of their race. She expressed concern that, following his own termination, a former African-American employee warned her and her fiancé that they would be the next targets. She also reiterated her concern that African Americans were passed up for promotions and that she was denied a pay raise, even though Lindloff approved one for a white employee, and that Lindloff failed to take action in response to another employee's racially derogatory remark. (Doc. ## 78, ¶ 76; 116, ¶ 76.) That evening, Lindloff gave Marshall the written reprimand, at which time she became emotional and cried. (Doc. # 78, ¶ 77.) Following that meeting, Lindloff recommended that Exelis terminate Marshall's employment. (*Id.,* ¶ 84.)

On November 9, 2012, Marshall told Site Manager Luther Murray that she was en route to the S3 Medical Clinic with chest pains and, then, that the clinic was referring her to Dubai for further testing. (Doc. # 116, ¶ 87.) Marshall gave Murray a note from an EMT at the clinic, stating that she needed "bed rest" until November 17, when she would "travel to Dubai for testing . . . ." (Doc. # 78, ¶ 88.) On November 11, Vice

President of Human Resources Frank Peloso decided to terminate Marshall's employment for insubordination.  (*Id.*, ¶ 89.)  That day, when Marshall came into the office to fill out medical leave paperwork, Bailey and Lindloff informed her that she was terminated.  (*Id.*, ¶ 90.)

The following day, Bailey and Lindloff went to the S3 Medical Clinic to request information related to Marshall's illness.  (*Id.*, ¶ 92.)  Bailey and Lindloff claim that because Exelis is required to promptly evacuate or "demobilize" from Bagram any employee whose employment has been terminated, they asked merely whether Marshall's medical condition prevented her from traveling before November 17 and if she could travel commercially or required a medevac.  (*Id.*, ¶¶ 91, 92.)  However, John Kronmiller wrote an email[2] complaining to Loper that Lindloff and Bailey "question[ed] the validity of a medical referral and the credibility of our medical staff."  (Doc. # 116-36.)  Kronmiller further stated, "S3 Medical Clinic is in no way associated with and does not report to your company regarding your employees, however, we also will not be lied to or be used to obtain a termination."  (*Id.*)  He also stated that Lindloff and Bailey "have gone above and beyond to attack a patient of the S3 Medical Clinic and tried to get information that they were not privy to . . . ."  (*Id.*)

On August 29, 2012, Marshall filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that she was discriminated against based on race and subjected to discriminatory and retaliatory discipline,

---

[2] Defendants object to the admissibility of this email as hearsay.  However, Marshall has designated Kronmiller as a witness.  Therefore, even if the contents of the email are not admissible at trial, the Court considers it as demonstrative of what his testimony will be at trial.

including discharge.  (Doc. # 78-5.)  On March 1, 2013, Marshall filed the instant action.

(Doc. # 1.)  Both Defendants moved for summary judgment, which is ripe for this Court's

review.  (Doc. ## 78, 79, 110, 111, 116, 118, 126, 128.)

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is warranted when "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it is essential to the proper

disposition of the claim under the relevant substantive law.  *Wright v. Abbott Labs., Inc.*,

259 F.3d 1226, 1231-32 (10th Cir. 2001).  A dispute is "genuine" if the evidence is such

that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v.

Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997).  When reviewing motions for

summary judgment, a court must view the evidence in the light most favorable to the

non-moving party.  *Id.*  However, conclusory statements based merely on conjecture,

speculation, or subjective beliefs do not constitute competent summary judgment

evidence.  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating an absence of a

genuine dispute of material fact and entitlement to judgment as a matter of law.  *Id.*  In

attempting to meet this standard, a movant who does not bear the ultimate burden of

persuasion at trial does not need to disprove the other party's claim; rather, the movant

need simply point the Court to a lack of evidence for the other party on an essential

element of that party's claim.  *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th

Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.  *Id.*  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."  *Adler*, 144 F.3d at 671.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Id.*

### III. ANALYSIS

**A.    STATE LAW CLAIMS—OUTRAGEOUS CONDUCT AND INTENTIONAL INTERFERENCE WITH CONTRACT**

1.    Outrageous Conduct Claim Against Exelis

a.    *Preemption*

Exelis contends that the Defense Base Act ("DBA") bars Plaintiff's outrageous conduct claim.  The DBA extends and incorporates the provisions of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901, *et seq.,* to provide federal workers' compensation coverage for injuries suffered by certain classes of employees working outside the United States, including on military bases.  42 U.S.C. § 1651(a).  The DBA's purpose is to "provide uniformity and certainty in availability of compensation for injured employees on military bases outside of the United States." *Davila–Perez v. Lockheed Martin Corp.,* 202 F.3d 464, 468 (1st Cir. 2000).

Both the DBA and the LHWCA contain exclusivity provisions that preempt all state law claims.  *See* 42 U.S.C. § 1651(c) (DBA); 33 U.S.C. § 905(a) (LHWCA).

Courts evaluating this language have found that it clearly expresses Congress's intent that the DBA preempt any and all claims that fall within the ambit of that statute.[3]  Thus, if Marshall's injuries fall within the scope of the DBA, she cannot pursue her state law claims for outrageous conduct against Exelis.  Marshall does not contest that the DBA provides an exclusive remedy for a covered injury.  Instead, she argues that because she sustained injuries after her termination, her claim does not fall within the scope of the DBA because her injuries did not "aris[e] out of and in the course of employment."  *See* 33 U.S.C. § 902(2).  Specifically, Marshall alleges that, following her termination, (1) she lost her housing and dining privileges, (2) she was required to immediately leave Bagram, and (3) Exelis attempted to improperly obtain her medical information after she visited an on-base clinic with chest pains.

The DBA applies to claims for the "injury or death of any employee."  42 U.S.C. § 1651(a).  However, the DBA does not define "injury."  42 U.S.C. § 1651 *et seq*. Therefore, the Court looks to the LHWCA for a definition of "injury," which is defined as an:

> accidental injury or death arising out of and in the course of employment,
> and such occupational disease or infection as arises naturally out of such

---

[3] *See, e.g., Fisher v. Halliburton,* 667 F.3d 602 (5th Cir. 2012) ("[T]he coverage provisions of the Defense Base Act clearly evidence the intent that the act shall afford the sole remedy for injuries or death suffered by employees in the course of employments which fall within its scope.") (citation omitted); *Sickle v. Torres Advanced Enter. Solutions, LLC*, No. 11-CV-2224 (KBJ), 2013 WL 7231238 (D.D.C. Dec. 24, 2013); *Brink v. XE Holding, LLC,* 910 F.Supp.2d 242, 249-51 (D.D.C. 2012) (the DBA's exclusivity language bars state law causes of action related to claims for DBA benefits); *Nauert v. Ace Props. & Cas. Ins. Co.,* No. 104CV02547, 2005 WL 2085544, at *3 (D. Colo. Aug. 27, 2005) (the DBA's plain language preempts state law claims arising from alleged bad faith handling of LHWCA claims); *Martin v. Halliburton,* 808 F. Supp. 2d 983, 989 (S.D. Tex. 2011) (finding that the language of the DBA's exclusivity provision preempts common law claims that fall within the statute's scope).

> employment or as naturally or unavoidably results from such accidental
> injury, and includes an injury caused by the willful act of a third person
> directed against an employee because of his employment.

33 U.S.C. § 902(2).  This standard relaxes common law principles of causation:

> Workmen's compensation is not confined by common-law conceptions of
> scope of employment. The test of recovery is not a causal relation
> between the nature of employment of the injured person and the accident.
> Nor is it necessary that the employee be engaged at the time of the injury
> in activity of benefit to his employer. All that is required is that the
> 'obligations or conditions' of employment create the 'zone of special
> danger' out of which the injury arose.

*O'Leary v. Brown–Pacific–Maxon, Inc.,* 340 U.S. 504, 506-07 (1951) (internal citations

omitted); *see also Gondeck v. Pan American World Airways, Inc.,* 382 U.S. 25, 27

(1965).

Relying on an U.S. Department of Labor administrative decision, Exelis argues

that the DBA applies because Afghanistan is a "zone of special danger."  *M.P. v. Ser.

Emp'rs Int'l, Inc.*, 2007-LDA-00123, at 5 (Dep't of Labor Sept. 24, 2007); (Doc. # 126-2).

Exelis's reliance on this decision oversimplifies the analysis that this Court must

undertake to determine whether Marshall's claims fall within the ambit of the DBA.  As

the district court in *Jones v. Halliburton Co.* observed, "employment in an overseas

locale, and specifically within the Iraqi war zone, does not constitute in itself a condition

of employment creating a zone of special danger . . . ."  791 F. Supp. 2d 567, 584 (S.D.

Tex. 2011).  Rather, "[t]he 'zone of special danger' standard requires a court to focus

not only upon the place of employment, but also upon the conditions and obligations of

the employment."  *Id.*  Review of cases in which courts have engaged in this analysis is

instructive.

8

In *O'Leary*, the Supreme Court determined that an employee of a government contractor operating in Guam was within the zone of special danger when he died trying to rescue two drowning swimmers in a channel adjacent to a recreation center operated by his employer. 340 U.S. at 505. The Court stated, "A reasonable rescue attempt . . . may be one of the risks of the employment, an incident of the service, foreseeable, if not foreseen, and so covered by the statute." *Id.* at 507 (internal quotation marks and citation omitted). However, the *O'Leary* court acknowledged that there may be cases "where an employee even with the laudable purpose of helping another, might go so far from his employment and become so thoroughly disconnected from the service of his employer that it would be entirely unreasonable to say that injuries suffered by him arose out of and in the course of his employment." *Id.*

In *O'Keeffe v. Smith, Hinchman & Grylls Associates, Inc.*, the Supreme Court applied a deferential standard in reviewing an administrative decision awarding benefits and determined that a man employed at a defense base in South Korea was in the special zone of danger when he drowned during a Saturday outing while boating on a lake. 380 U.S. 359, 360-64 (1965). The Court found persuasive the terms and conditions of the decedent's employment, which included that he work on a 365 day per year basis, subject to call to the job site at any time; his transportation to Korea and back to the United States was at the employer's expense; all employees were considered "in the course of regular occupation from the time they leave the United States until their return"; and the employer provided neither housing nor recreational activities for its employees. *Id.* at 3063-64. The Court further observed that the

9

accident occurred during an outing to a lake located only 30 miles from the employer's

job site and, therefore, "[i]t was reasonable to conclude that recreational activities

contributed to a higher efficiency of the employer's work and that when conducted in the

restricted area of employment, on a work day, so to speak, and in a manner not

prohibited by the employer, such activity was an incident of the employment." *Id.* at

3064 (internal quotation marks and citation omitted).

        In *Jones*, the court determined that "review of the conditions and obligations of

Jones's employment for the KBR Defendants in Iraq, [makes] clear that they did not

create a zone of special danger, in the context of workers' compensation, out of which

her alleged injuries—sexual harassment and sexual assault—arose."  791 F. Supp. 2d

at 584.  The court acknowledged that although Jones's employment agreement

"explicitly outlines some risks of employment overseas, such as terrorism, war,

rebellion, labor strike or unrest, civil strife, and capture," the employer specifically

included a prohibition on sexual harassment in its standards for personal conduct.  *Id.*

        This Court is aware of no federal case discussing whether an employee remains

in the zone of special danger for injuries sustained following the termination of

employment.  *Cf. Kalama Svcs., Inc. v. Director, Office of Workers' Compensation*

*Programs*, 354 F.3d 1085, 1093 (9th Cir. 2004) (employee fired three months after

injury may maintain a workers' compensation claim under the LHWCA).  Again citing to

an administrative decision, Exelis argues that the DBA "covers injuries sustained after

employment ends but while an employee is still in the zone of danger." *Okeh v. Serv.*

*Emps. Int'l, Inc.*, Case No. 2013-LDA-111, at 19-20 (Dep't of Labor Apr. 21, 2014);

(Doc. # 126-1).  While this may be true in some cases, the operative inquiry requires courts to focus on whether the injury is related to the conditions and obligations of the employment.  *See Jones,* 791 F. Supp. 2d at 584.  *Okeh* confirms, rather than undermines this conclusion.  In *Okeh,* the administrative judge determined that although the claimant's employment had been terminated at the time of his injury, it "flowed directly from his employment in Iraq" because the employer was required to transport him back to the United States and he was injured during his convoy to the airport.  Case No. 2013-LDA-111, at 19-20.

In the instant case, Exelis states simply, "Employment termination, questions about ability to evacuate, and loss of company housing after demobilizing arose from the zone of danger created by Plaintiff's employment in Afghanistan."  (Doc. # 126 at 15.)  The Court agrees that Marshall's loss of housing and the requirement that she immediately leave Bagram arise from the obligations and conditions of her employment.  Therefore, to the extent Marshall asserts these facts as evidence of an injury that forms the basis of her outrageous conduct claim, the Court determines that it falls within the ambit of the DBA and is preempted.  However, there are disputed issues of material fact relating to whether Lindloff and Bailey attempted to obtain Marshall's medical records after she provided documentation that she was placed on bed rest in order to evacuate her from Bagram and, thus, bring that conduct within the zone of special danger because it relates to the obligations and conditions of her employment.  Thus, the Court reserves ruling on this issue until evidence is presented at trial.[4]

---

[4] At that time, the Court will likely ask the jury, via special interrogatory, whether Lindloff and

b.    *Merits*

Exelis contends that Marshall's outrageous conduct claim fails as a matter of law because she has not alleged conduct that is sufficiently "outrageous." *See Coors Brewing Co. v. Floyd*, 978 P.2d 663, 665-66 (Colo. 1999) (internal quotation marks omitted) ("Before permitting a plaintiff to present a claim for outrageous conduct to the jury, the trial court must initially rule on the threshold issue of whether the plaintiff's allegations of outrageous conduct are sufficiently outrageous as a matter of law . . . [*i.e.*,] whether reasonable persons could differ on the question.") Specifically, Marshall must show that Exelis's conduct here was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 666. To survive summary judgment on this claim, Marshall must present evidence "that the defendants engaged in outrageous conduct with the specific intent of causing severe emotional distress or that the defendants acted recklessly with the knowledge that there was a substantial probability that their conduct would cause severe emotional distress." *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 883 (Colo. 1994).

Exelis's argument—that Lindloff and Bailey's attempt to obtain Marshall's medical information was not actually "outrageous"—is, of course, premised on the view that they did so solely because Exelis was responsible for evacuating her from Bagram following her termination and they sought to obtain information related to her ability to evacuate.

_____

Bailey sought information to safely evacuate Marshall or for an improper purpose. Therefore, the parties should be prepared to submit jury instructions and verdict forms with this issue in mind.

The Court, however, concludes that a reasonable juror could determine, upon finding S3 Medical Clinic staff more credible than Lindloff or Bailey, that it is beyond the bounds of decency for an employer to attempt to obtain medical information about an employee in order to verify whether she was appropriately placed on medical leave to provide a post-hoc justification for the manner and timing of her termination.

### 2.   Outrageous Conduct Claim Against Lindloff

Likewise, Lindloff contends that the allegations against him are not sufficiently outrageous and, therefore, fail as a matter of law.  Even if the jury were to conclude that Lindloff's decision to fire Marshall was motivated by racial animus, that, alone, is insufficient to make her termination outrageous.  *See Grandchamp v. United Air Lines, Inc.*, 854 F.2d 381, 384 (10th Cir. 1988).  Instead, the manner of the termination must itself be outrageous.  *Id.*  The Court agrees with Lindloff that terminating Marshall's employment even though she was on medical leave is not sufficiently outrageous.  *See Brown v. Progressive Cas. Ins. Co.,* Civ. Action No. 90-F-1428, 1991 U.S. Dist. LEXIS 17812, *1-2, 13-14 (D. Colo. June 21, 1991).  Nor is terminating her employment even though she would lose her housing and dining privileges sufficiently outrageous.  Terminating employment will always include adverse consequences, but outrageous conduct claims are "reserved for those truly exceptional cases."  *Ayon v. Kent Denver Sch.*, No. 12-CV-2546-WJM-CBS, 2013 WL 1786978, at *4 (D. Colo. Apr. 26, 2013).  However, as with the claim against Exelis, it is for the jury to resolve factual disputes regarding allegations that Lindloff attempted to improperly procure Marshall's medical records.

3.    Intentional Interference with Contract

The tort of intentional interference with contractual relations is defined as:

One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Memorial Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.,* 690 P.2d 207, 210 (Colo. 1984) (citing Restatement (Second) of Torts § 766 (1979)).  Thus, to be liable for intentional interference with contract, a defendant must (1) be aware of a contract between two parties, (2) intend that one of the parties breach the contract, (3) and induce the party to breach or make it impossible for the party to perform the contract."  *Krystkowiak v. W.O. Brisben Cos., Inc.,* 90 P.3d 859, 871 (Colo. 2004) (en banc).  In addition, the defendant must have acted intentionally and improperly in causing the result.  *Id.* (citing *Trimble v. City & Cnty. of Denver*, 697 P.2d 716, 726 (Colo. 1985), *superseded by statute*, C.R.S. § 24-10-105, *as recognized in Colorado Dep't of Transp. v. Brown Grp. Retail, Inc.*, 182 P.3d 687 (Colo. 2008)).

Lindloff focuses on the third element, arguing that Marshall cannot establish that he acted improperly because she cannot prove that he was "motivated solely by the desire to harm [her] or to interfere in the contractual relations between the parties." (Doc. # 79 at 13) (citing *W.O. Brisben Companies, Inc. v. Krystkowiak*, 66 P.3d 133, 137 (Colo. App. 2002) *aff'd on other grounds,* 90 P.3d 859 (Colo. 2004)).  Lindloff argues that Marshall behaved unprofessionally, which serves as an independent basis for her termination.  However, the facts Lindloff points to simply rebut Marshall's claim that her

termination was precipitated by alleged improper and intentional actions. Therefore, she has provided sufficient evidence to raise genuine issues of fact that are material to whether Lindloff acted intentionally and improperly in terminating her employment. *See Ryskin v. Banner Health, Inc.,* No. 09-CV-01864-MEH-KMT, 2010 WL 4818062, at *12 (D. Colo. Nov. 9, 2010).

## B. FEDERAL LAW CLAIMS—RACE DISCRIMINATION AND RETALIATION CLAIMS

The Court first considers Exelis's argument that some of the allegedly discriminatory acts should be excluded from consideration because they are time-barred. An employee wishing to challenge an employment practice under Title VII must first "file" a "charge" of discrimination with the EEOC. *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1163 (10th Cir. 2007) (citing 42 U.S.C. § 2000e-5(e)(1)). Although the applicable deadline for filing a charge with the EEOC depends on a variety of circumstances, "the latest possible filing date is 300 days from the last allegedly unlawful act." *Id.* If the employee does not submit a timely EEOC charge, he or she may not proceed to court. *Id.*; *see also Semsroth v. City of Witchita*, 304 F. App'x 707, 717 (10th Cir. 2008) (unpublished) (affirming the district court's exclusion of conduct that occurred outside the 300-day window). It is Marshall's burden to show that her charge was timely. *Montes*, 497 F.3d at 1168. In this case, Marshall filed her charge of discrimination with the EEOC on August 29, 2012. (Doc. # 78-5.) Thus, any allegedly discriminatory acts that occurred prior to November 2, 2011 are time-barred.

In her Response, Marshall states, "[E]ven if some discriminatory acts fall outside the covered period, failing to exhaust administrative remedies does not bar an

employee from using the prior acts as background evidence in support of a timely claim." (Doc. # 116 at 40) (internal quotation marks omitted). While this may be true, Marshall has not met her burden of demonstrating the pre-November 2, 2011 acts are not time-barred. As such, any claims based on discriminatory acts that occurred prior to that date are time-barred and will not be allowed. Whether the prior acts can be introduced at trial as "background evidence" in support of a timely claim will depend on whether sufficient evidentiary foundation can be laid. This is a matter that will need to be addressed in a motion in limine.

Exelis also argues that Marshall failed to administratively exhaust claims based on conduct that was omitted from her charge. Specifically, Exelis argues that Marshall's claims that she received a final written warning on November 8, 2011, and that Exelis requested confidential information from the S3 Medical Clinic are not reasonably related to the allegations in her EEOC charge.[5] (Doc. # 78 at 14.)

> When an employee seeks judicial relief for incidents not listed in his [or her] original charge to the EEOC, the judicial complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the EEOC charge, including new acts occurring during the pendency of the charge before the EEOC. A claim is considered reasonably related when the conduct complained of would fall within the scope of the administrative investigation which can reasonably be expected to grow out of the charge that was made. This more lenient pleading standard contemplates the fact that administrative charges of unlawful employment practices are regularly filled out by employees who do not have the benefit of counsel. Thus, precise pleading is not required for Title VII purposes.

---

[5] Exelis also argues that Marshall's reassignment to the South Node is not reasonably related to the allegations in her EEOC charge. However, upon review of the response briefs and Final Pretrial Order, it does not appear that Marshall brings a claim that this reassignment was racially discriminatory or in retaliation for her claims of race discrimination. Therefore, the Court expresses no opinion on whether it reasonably relates to her EEOC charge claims.

*Mitchell v. City & Cnty. of Denver*, 112 F. App'x 662, 667 (10th Cir. 2004) (internal citations, quotations, and alterations omitted).

In her EEOC charge, Marshall alleges, "On or about November 8, 2011, I reported to the Project Manager that the Country Manager was racially discriminating against me." (Doc. # 78-5.)  This allegation is related to her final written warning, in which Lindloff reprimanded Marshall for accusing him of "being a racist."  (Doc. # 78-4.) Marshall also alleges, "During the time period from November 9, 2011 through November 17, 2011, I was put on bed rest based on a health condition which remains unresolved.  During this time period while under bed rest, I was improperly ordered to meet with management. . . . On or about November 11, 2011, I was discharged."  (Doc. # 78-5.)  Reading Marshall's EEOC charge liberally, the investigation of these claims would reasonably encompass her allegations that Exelis improperly requested her medication information from the S3 Medical Clinic to provide a post-hoc justification for her discharge.  Accordingly, the Court finds that Marshall has administratively exhausted these claims.

However, there are genuine disputes of material facts relating to Marshall's claims of race discrimination and retaliation.  Therefore, the Court limits Marshall's claims as discussed above and denies Exelis's motion in all other respects.

## IV.  CONCLUSION

For the reasons provided above, the Court GRANTS IN PART AND DENIES IN PART Exelis's Motion for Summary Judgment (Doc. # 78) as set forth in this order. Specifically, it is ORDERED that

1. There are genuine disputes of material fact regarding Marshall's outrageous conduct claim based on allegations that Exelis attempted to improperly obtain her medical information;

2. Marshall's race discrimination and retaliation claims based on pre-November 2, 2011 conduct are time barred;

3. There are genuine disputes of material fact regarding Marshall's race discrimination and retaliation claims for post-November 2, 2011 conduct;

It is FURTHER ORDERED that Lindloff's Motion for Summary Judgment (Doc. # 79) is GRANTED IN PART AND DENIED IN PART as set forth in this order.

Specifically, it is ORDERED that

1. Marshall's outrageous conduct claim is limited to allegations that Lindloff attempted to improperly obtain her medical information;

2. There are genuine disputes of material fact regarding Marshall's intentional interference with contract claim against Lindloff;

DATED:  March 26, 2015

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge